Slip Op. 16-37

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ITOCHU BUILDING PRODUCTS, CO., INC., | |
| Plaintiff, | |
| v. | Before: Mark A. Barnett, Judge |
| UNITED STATES, | Court No. 15-00009 |
| Defendant. | |
| MID-CONTINENT STEEL & WIRE, INC., | |
| Defendant-Intervenor. | |

OPINION AND ORDER

[Plaintiff's motion is granted and the determination is remanded to the Department of Commerce for further clarification or revision on the issue of affiliation.]

Dated:  April 15, 2016

*Ned H. Marshak*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, argued for plaintiff.  With him on the brief were *Bruce M. Mitchell, Andrew T. Schutz,* and *Kavita Mohan*.

*David F. D'Alessandris*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of Counsel on the brief were *Eric J. Singley*, U.S. Department of Justice, and *Elika Eftekhari*, U.S. Department of Commerce.

*Adam H. Gordon*, The Bristol Group PLLC, of Washington, DC, argued for defendant-intervenor.

Barnett, Judge:  In this action, Plaintiff, Itochu Building Products Company, Inc. ("Plaintiff" or "Itochu")[1] challenges the final determination of the U.S. Department of Commerce ("Defendant" or "Commerce") in the first administrative review of the antidumping duty order on certain steel nails from the United Arab Emirates (UAE) ("AD order").[2]  Plaintiff claims that Commerce should not have found affiliation between Dubai Wire FZE ("Dubai Wire") and Itochu, and, alternatively, that Commerce should not have based normal value on third country sales to Canada and should have used constructed value instead.[3]

For the reasons discussed below, the Court remands the determination for Commerce to clarify and, if necessary, revise its findings on affiliation.  The Court defers ruling on the use of Canadian sales to determine normal value pending the agency's determination on remand.

## BACKGROUND

On June 28, 2013, Commerce initiated the first administrative review of the antidumping duty order on *Certain Steel Nails from the United Arab Emirates*, for the

---

[1] The Court will refer to Plaintiff as Itochu except in direct quotations from the Administrative Record, where Plaintiff self-identifies as IBP.

[2] *See Certain Steel Nails from the United Arab Emirates,* 79 Fed. Reg. 78,396 (Dep't Commerce Dec. 30, 2014) (final results of antidumping duty administrative review; 2011-2013) ("*Final Results*"), P.R. 198, ECF No. 40 ("Public Joint App."), Doc. 34 and accompanying *Issues and Decision Mem.,* A-520-804 (Dec. 30, 2014) ("*Issues & Decision Memo*"), available at http://enforcement.trade.gov/frn/summary/uae/2014-30541-1.pdf (last visited Mar. 16, 2016), P.R. 185, Public Joint App., Doc. 35.

[3] *See generally* Confidential Br. in Supp. of Pl.'s Rule 56.2 Mot. for J. upon the Agency R. ("Pl.'s Br."), ECF No. 26.

period of review from November 3, 2011 through April 30, 2013 ("POR").[4]  Commerce

selected Dubai Wire as one of the mandatory respondents.[5]  Itochu was the importer of

record for multiple shipments of subject nails from the UAE produced and sold by Dubai

Wire during the POR.[6]

On May 28, 2014, Commerce preliminarily determined that Dubai Wire and

Itochu were affiliated parties.[7]  On June 18, 2014, Commerce issued the preliminary

results of its review and calculated Dubai Wire's dumping margin to be 3.88 percent;

however, this calculation was not based on treating Dubai Wire and Itochu as affiliated

due to outstanding questionnaires.[8]  The Department indicated its intention to "consider

Dubai Wire's responses to {those outstanding} questionnaires for the final results."[9]

Subsequently, on October 16, 2014, the Department issued a post-preliminary results

memorandum for Dubai Wire using the additional requested information, recalculating

the antidumping margin to be 18.13 percent.[10]  On December 30, 2014, Commerce

---

[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part,* 78 Fed. Reg. 38,924 (Dep't Commerce June 28, 2013), P.R. 14, Public Joint App., Doc 1.
[5] *See* Respondent Selection Letter (July 11, 2013), P.R. 16, Public Joint App., Doc. 2.
[6] Pl.'s Br. at 1.
[7] *See generally* DOC Affiliation Mem. for Dubai Wire FZE (May 28, 2014)("*Affiliation Memo*"), C.R. 52, ECF No. 39-1 ("Confidential Joint App."), Doc. 19.
[8] *Certain Steel Nails from the United Arab Emirates,* 79 Fed. Reg. 35,721 (Dep't Commerce June 24, 2014) (preliminary results of antidumping duty administrative review) ("*Preliminary Results*") and accompanying *Decision Mem.,* A-520-804 (June 18, 2014) ("*Preliminary Memo*"), P.R. 94, Public Joint App., Doc. 21.
[9] *Affiliation Memo* at 1-2.
[10] Post-Preliminary Results Analysis Mem.; 2011-2013 at 6 (Oct. 16, 2014) ("*Post-Prelim. Memo*"), P.R. 164, Public Joint App., Doc. 29, at 6; *see also Final Results*, 79 Fed. Reg. at 78,397.

issued the Final Results of its review and confirmed that Dubai Wire's antidumping duty

margin was 18.13 percent.[11]

In this case, Itochu challenges Commerce's finding that Dubai Wire and Itochu

are affiliated and, in the alternative, Commerce's determination to base normal value on

third country sales to Canada rather than using constructed value.  For the reasons

discussed below, the Court remands the determination to Commerce to provide further

explanation of its determination to find Dubai Wire and Itochu to be affiliated or to

otherwise reconsider that determination.  The Court defers ruling on the use of

Canadian sales to determine normal value pending the agency's determination on

remand.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012) and 28 U.S.C. § 1581(c) (2012).[12]

The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.[13]  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."[14]  It "'requires more than a mere scintilla," but "less than the weight of the

---

[11] *See generally Final Results,* 79 Fed. Reg. 78,396 and *Issues & Decision Memo.*
[12] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition.
[13] 19 U.S.C. § 1516a(b)(1)(B)(i).
[14] *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

evidence."[15]  In determining whether substantial evidence supports Commerce's

determination, the court must consider "the record as a whole, including evidence that

supports as well as evidence that 'fairly detracts from the substantiality of the

evidence.'"[16]  The court "may not reweigh the evidence or substitute its own judgment

for that of the agency."[17]  In sum, "in order for Commerce's determination to be

sustained, the determination must be reasonable, supported by the record as a whole,

and the grounds that the administrative agency acted upon clearly disclosed."[18]

      The Court reviews Commerce's legal interpretations of the statutes it administers

under the "otherwise in accordance with law" standard.[19]  To do so, the Court utilizes

the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Resources Defense

Council, Inc.*[20]  First, the Court determines "whether Congress has directly spoken to

the precise question at issue."[21]  If Congress's intent is clear, "that is the end of the

---

[15] *Nucor Corp. v. United States*, 34 CIT 70, 72, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).
[16] *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).
[17] *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted).
[18] *Viraj Forgings, Ltd. v. United States*, 27 CIT 1472, 1474, 283 F. Supp. 2d 1335, 1338 (2003) (internal citations omitted).
[19] *Alloy Piping Products, Inc. v. United States,* 26 CIT 330, 333-34, 201 F. Supp. 2d 1267, 1271 (2002).
[20] 467 U.S. 837, 842-45 (1984).
[21] *Heino v. Shinseki*, 683 F.3d 1372, 1377 (Fed. Cir. 2012) (quoting *Chevron*, 467 U.S. at 842).

matter."[22]  However, "[i]f the statute is silent or ambiguous," the Court must determine

"whether the agency's [action] is based on a permissible construction of the statute."[23]

## DISCUSSION

Plaintiff challenges Commerce's determination that Dubai Wire and Itochu are

affiliated, and, in the alternative, argues that Commerce should not have based normal

value on third country sales to Canada and should have used constructed value

instead.

## I.   AFFILIATION BETWEEN DUBAI WIRE AND ITOCHU

In its *Affiliation Memorandum*, issued prior to the *Preliminary Results*, Commerce

described the relationship between the relevant corporate entities as follows:

> IBP {Itochu Building Products, Inc.} is part of the Itochu group of
> companies, which includes its sister company PrimeSource, the joint
> venture partner with Integrated Business Group USA LLC (IBG), a wholly-
> owned subsidiary of DWE {Dubai Wire FZE}.  PrimeSource and IBG each
> own 50 percent of the joint venture company Progressive Steel and Wire
> LLC (PSW), a producer of nails in the United States.  The record indicates
> that DWE is 100 percent owned by its parent company Dubai Wire
> Products Limited (DWP), and DWE owns 100 percent of IBG, a company
> formed in November 2011 for the purpose of creating the joint venture
> company, PSW, with joint venture partner PrimeSource.  DWE stated that
> PrimeSource and its sister company IBP are each 80 percent owned by
> Itochu International USA (Itochu USA), and Itochu USA's parent company,
> Itochu Corporation (Japan)(Itochu Japan) owns 100 percent of Itochu USA
> and 20 percent of both PrimeSource and IBP . . . the record indicates that
> the PSW joint venture is 50 percent owned by the DWE business structure
> and 50 percent owned by the IBP business structure.[24]

---

[22] *Id.* (quoting *Chevron*, 467 U.S. at 842-43).

[23] *Dominion Res., Inc. v. United States*, 681 F.3d 1313, 1317 (Fed. Cir. 2012) (citing *Chevron*, 467 U.S. at 842-43).

[24] *Affiliation Memo* at 3-4 (internal citations omitted).  While some company names were identified as business proprietary during the administrative review, during the oral argument in this case, Itochu agreed to the release of this proprietary information.  *See*

Commerce further stated that it considered "DWP, DWE and IBG to be a single

corporate entity" (the "Dubai Wire group") and "Itochu Japan, Itochu USA, PrimeSource

and IBP to be a single corporate entity" (the "Itochu group").[25]

In the *Issues & Decision Memorandum* accompanying the Final Results,

Commerce confirmed its determination that the Itochu and Dubai Wire groups were

affiliated through their joint ownership of PSW and cited to the previously issued

*Affiliation Memorandum* for details on its affiliation determination.[26]  Commerce rejected

Plaintiff's arguments that actual control had to exist for a finding of affiliation pursuant to

19 U.S.C. 1677(33) and explained:

> [I]n determining whether control over another person exists in a JV within
> the meaning of section 771(33) of the Act, we must only find the *potential*
> to impact decisions concerning the production, pricing, or cost of the
> subject merchandise or foreign like product . . . In our Affiliation Memo we
> determined that, based on record evidence of ownership of PSW, the
> Dubai Wire and IBP corporate entities were in a position to exert control
> over each other via the JV, not that they actually exerted control over each
> other.[27]

Before this Court, Plaintiff does not contest the existence of the joint venture or

that "Itochu and Dubai Wire both were legally in a position to exert control over PSW."[28]

Instead, Plaintiff argues that merely determining the existence of a corporate

---

Transcript of Oral Argument at 3 ("Oral Arg.") (Itochu's counsel stated "as far as we're
concerned, the names are public"), ECF No. 59.  Therefore, brackets have been
removed in the quotation.
[25] *Id.* at 4.
[26] *Issues & Decision Memo* at 6.
[27] *Id*. (emphasis original).
[28] Pl.'s Br. at 18.

relationship is not the end of the affiliation analysis.[29]  Plaintiff argues that Commerce

has not identified evidence to support its finding and has not addressed the evidence

presented by Dubai Wire and Itochu "demonstrating that {the joint venture} relationship

does not result in a potential to impact decisions."[30]

In its brief to the Court, Plaintiff renews the arguments it made to the agency

below, that "there is no evidence that it had control over the production, pricing, or cost

of nails produced by Dubai Wire," pointing to facts showing the absence of actual

control.[31]  In sum, Itochu claims that the record demonstrates that Dubai Wire dealt with

IBP in an arms-length manner, both before and after the formation of the joint-venture,

and that the sales process between the two companies, including prices paid for

merchandise, was no different than the sales process between IBP and its other

vendors.[32]  Additionally, Itochu contends that the record shows that Dubai Wire and IBP

did not share internal information, such as costs, profits or prices to other customers.[33]

Finally, Itochu claims that Dubai Wire is only one of IBP's many vendors and that IBP

sells many different products in the U.S. in addition to nails.[34]

Plaintiff argues that the factors above show that Itochu did not exercise control

over or impact Dubai Wire's production, pricing or cost of subject merchandise.[35]

---

[29] *Id.*
[30] *Id.* at 20-21.
[31] *Issues & Decision Memo* at 5; *see also* Pl.'s Br. at 21-25.
[32] *See* IBP's Admin. Case Br. ("IBP's Case Br.") at 4-6 (Oct. 31, 2014), C.R. 151, ECF No. 39-3, Confidential Joint App., Doc. 30.
[33] *Id.* at 4.
[34] *Id.* at 5*; see also* Pl.'s Br. at 21-25.
[35] *See generally* Pl.'s Br. at 21-26.

Further, Plaintiff notes that Commerce did not sufficiently explain its rationale for finding affiliation and that the reasoning offered by Defendant in briefing is post hoc rationalization.[36]  Consequently, plaintiff asks the court to reverse Commerce's finding on affiliation and remand the issue for further consideration.[37]

Defendant and Defendant-Intervenor assert that Commerce's finding of affiliation is supported by substantial evidence on the record.[38]  Defendant argues that Commerce's finding of affiliation was based on the Dubai Wire group and Itochu group's "joint ownership of a subsidiary."[39]  Finally, Defendant argues that once Commerce has made a finding of affiliation, the burden is on the respondent to show that the relationship did not have the potential to affect the subject merchandise or foreign like product.[40]

The statute defines affiliated persons as, among other things, "two or more persons directly or indirectly controlling, controlled by, or under common control with, any person."[41]  The statute further states that "a person shall be considered to control

---

[36] *Id.* at 16-21; Pl.'s Confidential Reply Br. ("Reply") at 3-5, ECF No. 37.
[37] Pl.'s Br. at 26.
[38] *See generally* Def.'s Confidential Opp'n to Pl.'s Rule 56.2 Mot. for J. upon the Agency R. ("Def's Opp'n") at 6-19, ECF No. 35; Confidential Response Br. of Def.-Intervenor Mid-Continent Steel & Wire, Inc. ("Def.-Intervenor's Br.") at 10-15, ECF No. 33.
[39] Def.'s Opp'n at 10.
[40] *Id.* at 15.
[41] 19 U.S.C. § 1677(33)(F).

another person if the person is legally or operationally in a position to exercise restraint

or direction over the other person."[42]  Commerce's regulations provide that:

> {i}n determining whether control over another person exists, within the
> meaning of section 771(33) of the Act, the Secretary will consider the
> following factors, among others: Corporate or family groupings; franchise
> or *joint venture agreements*; debt financing; and close supplier
> relationships.  The Secretary will not find that control exists on the basis of
> these factors unless the relationship has the *potential to impact decisions*
> *concerning the production, pricing, or cost of the subject merchandise or*
> *foreign like product*.  The Secretary will consider the temporal aspect of a
> relationship in determining whether control exists; normally, temporary
> circumstances will not suffice as evidence of control.[43]

In the *preamble* to these regulations, the Department of Commerce confirmed its

"focus on relationships that have the potential to impact decisions concerning

production, pricing or cost" and that "section 771(33) . . . properly focuses the

Department on the ability to exercise 'control' rather than the actuality of control

over specific decisions."[44]  The Department decided that it could not, through

regulation, create a bright-line test for whether control exists because the inquiry

required "fact-specific determinations" and, instead, determined that guidelines

would be established gradually "through the resolution of issues in actual

cases."[45]

       In *Mitsubishi Heavy Industries v. United States,* this court upheld Commerce's

determination that Mitsubishi and a particular trading company were affiliated pursuant

---

[42] *Id.* § 1677(33).
[43] 19 C.F.R. § 351.102(b)(3) (2012) (emphasis added).
[44] *Antidumping Duties; Countervailing Duties,* 62 Fed. Reg. 27,296, 27,297-98 (Dep't
Commerce May 19, 1997) (final rule).
[45] *Id*. at 27,298.

to 19 U.S.C. § 1677(33)(F) as a result of their joint venture, MLP, because the trading

company "owned a significant interest in MLP, . . . made substantial loans to MLP" and

because Mitsubishi and the trading company "were the only shareholders of MLP and

had a history of common ownership in various companies suggest[ing] that they worked

together in managing MLP."[46]

Subsequently, the court confirmed *Mitsubishi's* approach to analyzing affiliation

through a joint venture, stating that "two elements must be satisfied for affiliation to

exist.  First, two parties must be legally or operationally in a position to exercise restraint

or direction over a third party.  Second, the relationship with the third party must have

the potential to impact decisions concerning the production, pricing, or cost of the

subject merchandise."[47]  In *TIJID*, the court upheld Commerce's determination that

affiliation did not exist because having a shared officer/board member was not, by itself,

sufficient for the direct or indirect exercise of control, and the joint venture in question

was not involved in sales of the subject merchandise.[48]

The Court will uphold a Commerce determination provided the path to that

determination is reasonably discernable from the determination itself.[49]  In its review,

the "court must consider whether the decision was based on a consideration of the

---

[46] *See* 23 CIT 326, 335, 54 F. Supp. 2d 1183, 1192 (1999).
[47] *TIJID, Inc. v. United States,* 29 CIT 307, 314, 366 F. Supp. 2d 1286, 1293 (2005)
(internal citations omitted).
[48] *TIJID,* 29 CIT at 315-16, 366 F. Supp. 2d at 1294.
[49] *See NMB Singapore Ltd. v. United States,* 557 F. 3d 1316, 1319 (Fed. Cir. 2009)
("Commerce must explain the basis for its decisions; while its explanations do not have
to be perfect, the path of Commerce's decision must be reasonably discernable to a
reviewing court.") (internal citations omitted).

relevant factors. . . . [t]he agency must articulate a rational connection between the facts found and the choice made."[50]  While the agency is not required to "make an explicit response to every argument made by a party," it is required to discuss "issues material to the agency's determination."[51]  Further, the Court may not accept "post hoc rationalizations for agency action" and may only sustain the agency's decision "on the same basis articulated in the order by the agency itself."[52]  Thus, reasoning that is offered post-hoc, in briefing to the Court or during oral argument, is not properly part of this Court's review of the agency's underlying determination when such reasoning is not discernable from the record itself.

Here, Commerce examined the corporate relationships between Dubai Wire and Itochu and found the two companies to be affiliated.  Commerce went on, in a single sentence, to conclude that "the relationship between {the Dubai Wire group} and {the Itochu group} via the PSW joint venture, which produces identical merchandise in the United States, has the potential to have an impact on decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product."[53]  This *Affiliation Memorandum*, however, on its face, simply recommended a preliminary finding of affiliation.[54]  While the agency may draw reasonable inferences from the

---

[50] *Bowman Transp., Inc. v. Ark. Best Freight System, Inc.,* 419 U.S. 281, 385-86 (1974) (internal citations omitted).
[51] *Timken U.S. Corp. v. United States,* 421 F. 3d 1350, 1354 (Fed. Cir. 2005).
[52] *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168-69 (1962).
[53] *Affiliation Memo* at 4.
[54] *Id.* at 1.

evidence, no further analysis of the facts presented or arguments subsequently made to the agency appears to have occurred in this review.

Following the *Preliminary Results* and the post-preliminary recalculation of Dubai Wire's dumping margin, Plaintiff submitted a case brief to the agency in which it made the numerous points listed above; asserting, in sum, that there was no actual control and that the record facts supported a finding of an absence of control.[55]  In response, in its *Issues & Decision Memorandum* for the Final Results, Commerce simply restated its finding that "based on record evidence of ownership of PSW, the Dubai Wire and IBP corporate entities were in a position to exert control over each other via the JV."[56] However, merely finding proof of 50-50 ownership of the joint venture is insufficient for a finding of control pursuant to 19 CFR § 351.102(b)(3).[57]

Pursuant to 19 U.S.C. § 1677(33)(F), co-ownership of the joint venture is sufficient to establish that the Itochu and Dubai Wire groups are legally or operationally in a position to exert control over PSW.  Commerce's regulation, however, also requires Commerce to find that the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or the foreign like product.[58] In order to address this regulatory standard, Commerce needed to explain how the record supports its finding in the face of the contrary record evidence relied upon by Itochu.  It did not do so.

---

[55] *See* IBP's Case Br. at 4-6.
[56] *Issues & Decision Memo* at 6.
[57] *See TIJID,* 29 CIT at 314, 366 F. Supp. 2d at 1293.
[58] *See* 19 CFR § 351.102(b)(3).

Before the Court, the Defendant claims that the reference to the fact that PSW

"produces identical merchandise in the United States," provides the path of reasoning

for Commerce's conclusion.[59]  While Commerce may find it to be relevant that PSW

produces identical merchandise in the United States, that factual statement, by itself, is

insufficient to provide a path of reasoning as to how the relationship has the potential to

impact decisions concerning the production, pricing, or cost of the subject merchandise

or foreign like product.  The merchandise produced by PSW is neither subject

merchandise nor foreign like product.  It is the role of the agency, not the agency's

counsel or the Court, to provide the path of reasoning that explains the relevance of

PSW's production of identical merchandise in the United States to the production,

pricing, or cost of Dubai Wire's subject merchandise or foreign like product, and the

agency will have the opportunity to do that on remand.  The determination will be

remanded to Commerce so that the agency may further explain or, if needed, revise, its

finding of affiliation.

## II.    CANADA AS THE THIRD COUNTRY MARKET

In this case, Plaintiff has made clear that its argument that the agency's finding

that Canadian sales were viable is not in accordance with law is an alternative

argument, made in case the Court affirms the agency's determination that Dubai Wire

and Itochu are affiliated.[60]  At this time, the Court is remanding that determination for

further explanation or revision.  The Court has not affirmed the agency's affiliation

---

[59] *Affiliation Memo* at 4; *see also* Oral Arg. at 30.
[60] Pl.'s Confidential Rule 56.2 Mot. for J. upon the Agency R., ECF No. 26.

finding and, on remand, Commerce may decide to alter that determination, obviating the need to address this issue.  Thus, in order to avoid an unnecessary, advisory ruling on this issue, the Court defers ruling on Plaintiff's alternative argument pending the remand determination.[61]

### CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Final Determination is remanded to Commerce to further explain its affiliation finding with respect to Dubai Wire, as discussed herein, or to alter that determination; it is further

**ORDERED** that the Court defers ruling on the third country viability issue pending the remand determination; it is further

**ORDERED** that Commerce shall file its remand results on or before July 14, 2016; and it is further

**ORDERED** that, notwithstanding USCIT Rule 56.2(h)(1)-(4), the agency must file an index of any new administrative record documents within 7 days of the date of filing the remand determination; and it is further

---

[61] *United States v. Roy Fruehauf,* 365 U.S. 146, 157 (1961) (a federal court will not give an advisory opinion or an "advance expression[ ] of legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges . . . [as] necessary for decision"); *Verson, A Division of Allied Prods. Corp. v. United States,* 22 CIT 151, 153, 5 F. Supp. 2d 963, 966 (1998) ("a federal court does not have the power to render an advisory opinion on a question simply because [it] may have to face the same question in the future") (citations omitted).

**ORDERED** that parties may file and serve comments in opposition to the remand determination within 14 days after the date of filing the remand determination; and it is further

**ORDERED** that defendant and other parties supporting the remand determination may file and serve responsive comments within 14 days after the filing of comments in opposition to the remand determination; and it is further

**ORDERED** that parties must file a joint appendix of any record documents cited in their comments within 7 days of the filing of responsive comments; and it is further

**ORDERED** that any comments or responsive comments must not exceed 2500 words.


/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: April 15, 2016
       New York, New York