Slip Op. 17-17

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ITOCHU BUILDING PRODUCTS, CO., INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> MID CONTINENT STEEL & WIRE, INC., <br><br> Defendant-Intervenor. | Before: Mark A. Barnett, Judge <br><br> Court No. 15-00009 <br><br> **PUBLIC VERSION** |

OPINION

[The court sustains Commerce's Remand Redetermination on the issue of affiliation and denies Plaintiff's Motion for Judgment on the Agency Record on the use of third country sales to determine normal value.]

Dated: February 16, 2017

Bruce M. Mitchell, Ned H. Marshak, and Andrew T. Schutz, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP of New York, NY for plaintiff.

Eric J. Singley, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of Counsel on the brief was Henry J. Loyer, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Adam H. Gordon and Ping Gong, The Bristol Group PLLC of Washington DC, for defendant-intervenor.

Barnett, Judge: This case is before the court following the Department of Commerce's ("Commerce") remand redetermination in the first administrative review of the antidumping duty order on certain steel nails from the United Arab Emirates (UAE). Confidential Final Results of Redetermination Pursuant to *Itochu Building Products, Co., Inc. v. United States*, [ ] Court No. 15-00009, Slip Op. 16-37 (CIT April 15, 2016) ("Remand Redet."), ECF No. 63-1; *see also Itochu Building Products, Co., Inc. v. United States* ("*Itochu*"), 40 CIT ___, 163 F. Supp. 3d 1330 (2016); *Certain Steel Nails from the United Arab Emirates*, 79 Fed. Reg. 78,396 (Dep't Commerce Dec. 30, 2014) (final results of antidumping duty admin. review; 2011-2013) ("Final Results"), Public Joint App. ("PJA") Doc. 34, ECF No. 40; Public Admin. R. ("PR")[1] 198, ECF No. 19; and accompanying *Issues and Decision Mem.*, A-520-804 (Dep't Commerce Dec. 22, 2014) ("I&D Mem."), PJA Doc. 35; PR 185. In *Itochu*, the court directed Commerce to "further explain its affiliation finding with respect to Dubai Wire . . . or to alter that determination." *Itochu*, 40 CIT at ___, 163 F. Supp. 3d at 1339. The court deferred ruling on Plaintiff Itochu Building Co., Inc.'s ("Plaintiff" or "Itochu")[2] alternative argument regarding the third country viability of Dubai Wire FZE's ("Dubai Wire") sales to Canada pending the

---

[1] Parties filed a public and a confidential joint appendix, and the United States filed public and confidential versions of the administrative record. *See* PJA; Confidential Joint App. ("CJA"), ECF No. 39; PR; Confidential Admin. R. ("CR"), ECF No. 19. All further citations are to documents contained in the confidential joint appendix unless otherwise noted.

[2] The court will refer to Plaintiff as Itochu except in direct quotations from the Administrative Record, when Plaintiff self-identifies as IBP.

remand redetermination.  *Id.*  Familiarity with the court's earlier decision in this case is presumed.

Upon consideration of the court's remand instructions, Commerce again determined that Dubai Wire and Itochu are affiliated via the joint-venture company Progressive Steel & Wire, LLC ("PSW").  Commerce also determined that this affiliation has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or the foreign like product.  Remand Redet. at 1-2.  Plaintiff challenges Commerce's finding as unsupported by substantial evidence.  *See generally* Confidential Pl.'s Comments in Opp'n to the Redet. Pursuant to Court Remand, ECF No. 70 ("Pl.'s Opp'n to Remand Redet.").  Defendant and Defendant-Intervenor, Mid Continent Steel & Wire, Inc. ("Mid Continent") support Commerce's remand redetermination.  *See* Confidential Def.'s Resp. to Comments on the Remand Redet. ("Def.'s Resp. to Pl.'s Opp'n"), ECF No. 76; Confidential Def.-Intervenor Mid Continent Steel & Wire, Inc.'s Resp. Comments in Supp. of Remand Results ("Def.-Intervenor's Resp. to Pl.'s Opp'n"), ECF No. 74.

For the reasons discussed below, the court sustains Commerce's remand redetermination.  The court also sustains Commerce's Final Results on the issue of the viability of Canadian sales to determine normal value.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[3] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Affiliation between Itochu and Dubai Wire

The issue before the court is whether Commerce's finding of affiliation between Itochu and Dubai Wire is supported by substantial evidence.  Plaintiff asserts that Commerce ignored evidence showing that Itochu and Dubai Wire's corporate relationship did not impact production, pricing, or cost of subject merchandise because Itochu dealt with Dubai Wire in the same manner in which it dealt with dozens of other vendors, and the corporate relationship between Itochu and Dubai Wire did not impact the manner in which they conducted business with each other.  *See generally* Pl.'s Opp'n to Remand Redet.  Plaintiff's arguments are unavailing.

Briefly, 19 U.S.C. § 1677(33) defines affiliation, in relevant part, as "two or more persons directly or indirectly controlling, controlled by, or under common control with, any person" and further, that "a person shall be considered to control another person if

---

[3] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition and all references to the United States Code are to the 2012 edition, unless otherwise stated.

the person is legally or operationally in a position to exercise restraint or direction over the other person." Commerce's regulations further provide that

> [i]n determining whether control over another person exists, within the meaning of section 771(33) of the Act, the Secretary will consider the following factors, among others: corporate or family groupings; franchise or *joint venture agreements*; debt financing; and close supplier relationships. The Secretary will not find that control exists on the basis of these factors unless the relationship has the *potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product*…

19 C.F.R. § 351.102(b)(3) (2012) (emphasis added). In the preamble to these regulations, Commerce confirmed its "focus on relationships that have the potential to impact decisions concerning production, pricing or cost" and that "section 771(33) . . . properly focuses [Commerce] on the ability to exercise 'control' rather than the actuality of control over specific decisions." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,297-98 (Dep't Commerce May 19, 1997) (final rule).[4]

During the administrative review, Commerce described the corporate relationship between the relevant entities as follows:

> IBP is part of the Itochu group of companies, which includes its sister company PrimeSource, the joint venture partner with Integrated Business Group USA LLC (IBG), a wholly-owned subsidiary of DWE. PrimeSource and IBG each own 50 percent of the joint venture company Progressive Steel and Wire LLC (PSW), a producer of nails in the United States. The record indicates that DWE is 100 percent owned by its parent company Dubai Wire Products Limited (DWP), and DWE owns 100 percent of IBG, a company formed in November 2011 for the purpose of creating the joint venture company, PSW, with joint venture partner PrimeSource. DWE stated that PrimeSource and its sister company IBP are each 80 percent owned by Itochu International USA (Itochu USA), and Itochu USA's parent company, Itochu Corporation (Japan) (Itochu Japan) owns 100 percent of

---

[4] For a more detailed discussion of the legal standard for affiliation, see *Itochu*, 40 CIT at ___, 163 F. Supp. 3d at 1336-37.

> Itochu USA and 20 percent of both PrimeSource and IBP . . . [t]he record indicates that the PSW joint venture is 50 percent owned by the DWE business structure and 50 percent owned by the IBP business structure.

Affiliation Mem. for Dubai Wire FZE (Dep't Commerce May 28, 2014) at 3-4, CJA Doc 19; CR 52 (internal citations and bracketing omitted).  Based on this understanding, Commerce concluded that "the relationship between [the Dubai Wire group] and [the Itochu group] via the PSW joint venture, which produces identical merchandise in the United States, has the potential to have an impact on decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *Id*. at 4.  Upon review, the court found that Commerce had failed to adequately explain its finding.  *See generally Itochu*, 40 CIT at ___, 163 F. Supp. 3d at 1338.  Consequently, the court remanded the determination for Commerce to further explain or reconsider its reasoning.

In its Remand Redetermination, Commerce again found Itochu and Dubai Wire to be affiliated.  *See generally* Remand Redet.  Specifically, Commerce pointed to six factors to support its finding of affiliation: (1) Itochu was, by far, Dubai Wire's largest customer for nails in both the United States and Canada during the POR;[5] Itochu resold the nails purchased from Dubai Wire to PrimeSource, which in turn sold the nails, and nails it separately purchased from PSW, to unaffiliated customers; (2) Dubai Wire sold a

---

[5] Itochu purchased [[   ]] percent of Dubai Wire's total U.S. sales of subject merchandise, and [[   ]] percent of Dubai Wire's total Canada sales of subject merchandise during the POR.  Remand Redet. at 8.

substantial portion of its total production of subject merchandise to Itochu;[6] (3) officers and directors from both PrimeSource/Itochu and Dubai Wire also serve on the board of PSW; (4) PSW produces merchandise that is identical to the subject merchandise; (5) Itochu sends both UAE origin nails (subject merchandise) and non-UAE origin nails to PrimeSource, where all nails are commingled and lose their identity of origin; and, (6) PrimeSource directs the production and pricing of nails by PSW, buys all PSW nail output, and commingles them with the nails produced by Dubai Wire. *Id*. at 8-9. In sum, Commerce found that "the relationship between [Itochu] and Dubai Wire accounts for a high percentage of Dubai Wire's sales, the PSW joint venture produces merchandise identical to the subject merchandise and foreign like product, and all such nails lose their 'identity' in PrimeSource's warehouse." *Id*. at 9. Commerce concluded that Itochu's relationship with Dubai Wire, through the joint venture, has the potential to impact production, cost, or pricing of the subject merchandise or foreign like product. *Id*.

Commerce also explained that, in addition to the six factors above, the PSW joint-venture was specifically created to produce steel nails in the United States and to be responsive to PrimeSource's (and consequently, Itochu's) needs. *Id*. at 15. When combined with the fact of overlapping officers and directors between Dubai Wire, Itochu and PSW, "the existence of the PSW joint venture to produce nails necessarily create[d] the potential to impact decisions concerning […] the specific steel nail products that

---

[6] During the POR, Dubai Wire sold [[     ]] percent of its production of nails to Itochu. *Id.*

would be produced in Texas versus the UAE, where certain costs would be incurred, recorded, recognized, and what prices would be charged for subject merchandise." *Id*. at 15-16. This was particularly true here when the same employees could make these decisions for both Dubai Wire and PSW. *Id*. at 16.

In challenging the remand redetermination, Plaintiff argues that Commerce's finding was flawed because Itochu had the same degree of control in its purchases of nails from Dubai Wire as it did in its purchases from other vendors, and because Commerce failed to rebut Itochu's arguments (and evidence) that the joint venture between Itochu and Dubai Wire did not impact the relationship between the two corporate groupings. *See* Pl.'s Opp'n to Remand Redet. at 2-4.

Plaintiff's arguments to the court simply restate arguments it made during the remand proceeding and which Commerce considered and rejected. Those arguments are equally unconvincing to the court.

Plaintiff asserts that it treated Dubai Wire in the same manner it treated its other vendors. *See* Pl.'s Opp'n to Remand Redet. at 5-6. Commerce rejected this argument, finding that Itochu's relationship with other vendors is not relevant to whether Itochu had the potential to control production, pricing, or cost decisions with respect to Dubai Wire, with which it owned and operated a joint venture. *See* Remand Redet. at 9-10, 16-19. One record basis for Plaintiff's claim is a hand-written chart showing the average unit values for nails purchased by Itochu in the United States from its top 11 vendors. Dubai Wire Summary of Ex Parte Meeting of April 3, 2014 ("Ex Parte Meeting"), Ex. 1, CJA Doc. 15; CR 45. Commerce considered and declined to rely on this information, noting

that it found CONNUM specific pricing data (i.e., data based on particular models of nails or "control numbers") to be more relevant. *See generally* Remand Redet. at 10-11, 18-19. Moreover, even Dubai Wire appears to have recognized the limited value of this chart, admitting that the differences in average unit values reflect the differences in product mixes purchased from the various vendors. Ex Parte Meeting at 2 n. 1.

      The second record basis for Plaintiff's claim is a chart comparing the prices charged by Dubai Wire to Itochu with the prices charged by Dubai Wire to other, unaffiliated companies, when Dubai Wire had sales of the identical CONNUMs to both within the same month. *See* Ex Parte Meeting, Ex. 2. There were a significant number of such pairings,[7] *id.* at 1, and Dubai Wire/Itochu have argued that the fact that Itochu paid more than other customers approximately one-third of the time is indicative of the arm's length nature of the relationship between the two corporate groupings. *See* IBP's Case Br. (Oct. 31, 2014) at 4, CJA Doc 30; CR 151; *see also* IBP Comments on Draft Results of the Redetermination at 6, Confidential Joint Appendix of New Documents on Redetermination Pursuant to Court Remand ("Remand Redetermination CJA") Doc R 2, ECF No. 78; Public Remand R. ("PRR") 1, ECF No. 65; Pl.'s Opp'n to Remand Redet. at 5-8. Commerce considered this argument and found the fact that Itochu paid less to Dubai Wire in the other two-thirds of the comparisons to be more relevant to its determination of control. Remand Redet. at 9-10. In making the same argument to the court, Itochu is simply asking the court to reweigh the evidence that was considered by

---

[7] Dubai Wire identified [[   ]] such pairings in its submission. Ex Parte Meeting, Ex. 2 at 1.

Commerce. This, the court will not do. *Downhole Pipe & Equip., L.P. v. United States,* 776 F.3d 1369, 1377 (Fed. Cir. 2015) (citation omitted) (the court may not "reweigh the evidence . . . or consider questions of fact anew"); *see also Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted) (the court "may not reweigh the evidence or substitute its own judgment for that of the agency").

While Plaintiff's arguments to the court are made to appear broader, and more broadly supported, they are not. For example, Plaintiff cites to arguments made to Commerce about Itochu's and Dubai Wire's subjective perspectives on their relationship, *see* Pl.'s Opp'n to Remand Redet. at 2-4, but a party's subjective view of its corporate relationship, without more, does not rebut Commerce's record-based reasoning for finding that the relationship had the potential to influence decisions regarding the production, pricing and cost of subject merchandise or foreign like product. In addition to the two exhibits discussed above, Plaintiff referred the court to three other documents in the confidential record (CR 39, 70, and 83);[8] however, it provided no more precise citation within these documents or explanation of how it believed each of these documents supported its claim that Itochu "treated all of its vendors in the identical manner." Pl.'s Opp'n to Remand Redet. at 5, 6. Rather than providing supporting evidence for this claim, the referenced documents simply contain

---

[8] Dubai Wire Resp. to Suppl. Item 2(a) Questions (March 13, 2014), CJA Doc. 12; CR 39 (showing generally the corporate agreements in place between the Itochu and Dubai Wire entities); IBP Suppl. Section A and C Resp. (July 15, 2014), CJA Doc. 22; CR 70 (questionnaire response and corporate data pertaining to Dubai Wire); and Itochu Section C Resp. (July 15, 2014), CJA Doc. 24; CR 83 (U.S. sales data for Dubai Wire).

information regarding corporate structure and affiliations (CR 39 and 70), additional information on the sales process and adjustments to sales prices (CR 70), and explanation of the allocation methodology used to report sales of commingled nails out of PrimeSource's inventory in the United States (CR 83). Plaintiff has failed to identify how these documents support its claims regarding its treatment of different vendors and, upon review of the portions of the documents provided by Plaintiff in the Joint Appendix, the court was unable to discern any support for Plaintiff's position. Thus, while Itochu provided Commerce with "extensive documentation" relating to its purchases and sales, Commerce found that these documents did not support Itochu's contention that it treated all its vendors in an identical manner or that the joint venture did not create the potential to impact production, pricing, or cost of subject merchandise or foreign like product, and Plaintiff has identified no reason or evidence that would cause the court to disturb that finding. To the extent that documentary proof otherwise may exist, it was Plaintiff's burden to provide it to Commerce during the administrative proceeding. *Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333, 1337-38 (Fed. Cir. 2016) (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)) ("the burden of creating an adequate record lies with interested parties and not with Commerce").

In sum, Commerce reviewed the record evidence submitted by Itochu and Dubai Wire and, on that basis, found that corporate affiliation existed between the two groups, and the relationship had the potential to impact Dubai Wire's decisions regarding the production, pricing, or cost of subject merchandise or foreign like product. For the

reasons stated above, the court finds that Commerce's determination as to affiliation between the Itochu and Dubai Wire groups is supported by substantial evidence.

## II. Using Third Country Sales to Canada to Establish Normal Value

The court now turns to Plaintiff's alternative argument that, assuming that the court sustains Commerce's finding on affiliation, it should remand Commerce's Final Results because Canada was not a viable third country market and Commerce should have based its normal value calculation on constructed value. *See* Confidential Br. in Supp. of Pl.'s Rule 56.2 Mot. for J. upon the Agency R. ("Pl.'s Br.") at 26-31, ECF No. 26. Plaintiff argues that Commerce should have conducted its third country market viability test in accordance with Itochu and Dubai Wire's "commercial reality" and the manner in which Itochu reported its sales, i.e. by using sales "databases [that] include all warehouse sales of SKUs purchased from [Dubai Wire], regardless of origin." Pl.'s Br. at 30. Plaintiff argues that doing so would have shown that Canada was not a viable comparison market. *Id.* Defendant contends that Commerce's market viability test complied with the statutory requirement set forth in 19 U.S.C. § 1677b(a)(1)(B)(ii)(II), and that Plaintiff's preferred approach is contrary to the statute and to Commerce's practice. Confidential Def.'s Opp'n to Pl.'s Rule 56.2 Mot. for J. upon the Agency R. ("Def's Opp'n") at 20, ECF No. 35; *see also* Confidential Resp. Br. of Def.-Intervenor Mid Continent Steel & Wire, Inc. ("Def.-Intervenor's Br.") at 16-18, ECF No. 33 (Defendant-Intervenor concurs in Defendant's argument). The court had deferred ruling on this claim in *Itochu.* 40 CIT at ___, 163 F. Supp. 3d at 1339. Neither party has raised new arguments with respect to this issue in their latest briefing. *See generally*

Pl.'s Opp'n to Remand Redet.; Def.'s Resp. to Pl.'s Opp'n; Def.-Intervenor's Resp. to Pl.'s Opp'n.

Commerce determines dumping margins by "comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise." 19 U.S.C. § 1677f-1(d)(1)(A)(i). The statute defines normal value as "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1). Thus, the starting point for determining normal value is home market sales. The statute provides that the home market is not a viable basis for determining normal value if:

> the administering authority determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States.

19 U.S.C. § 1677b(a)(1)(C)(ii).

For the purposes of subparagraph (ii), home market sales "shall normally be considered to be insufficient if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States." 19 U.S.C. § 1677b(a)(1)(C). In this case, Commerce determined Dubai Wire's home market was not viable based on data provided by Dubai Wire, and Itochu does not dispute that finding. *Certain Steel Nails from the United Arab Emirates,* 79 Fed. Reg. 35,721 (Dep't Commerce June 24, 2014) (prelim. results of antidumping duty admin. review) ("Prelim. Results*"*) and accompanying *Decision Mem.,* A-520-804 (June 18,

2014) ("Prelim. Mem.") at 8, PJA Doc. 21; PR 94 (internal citations omitted); *see also* Dubai Wire Section A Resp. (Aug. 22, 2013) at 4, CJA Doc. 3; CR 4.

When the home market is not viable, Commerce may look to third country sales to determine normal value. In such cases, the statute also provides that a third country market must, among other things, be viable – specifically:

> the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by the exporter or producer in such other country is 5 percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States or for export to the United States.

19 U.S.C. 1677b(a)(1)(B)(ii)(II). Foreign like product is defined as merchandise "produced in the same country and by the same person as the subject merchandise." 19 U.S.C. § 1677(16)(B)(i).

If neither the home market nor the third country market are found to be viable, Commerce may use constructed value to determine normal value. 19 U.S.C. § 1677b(a)(4); *see also* 19 C.F.R. § 351.404(f) ("The Secretary normally will calculate normal value based on sales to a third country rather than on constructed value if adequate information is available and verifiable."). Once Commerce is satisfied that the third country market is viable, the party alleging that the prices are not representative or otherwise should not be used (i.e., as a result of a particular market situation) bears the burden of establishing this fact. *See Alloy Piping Products v. United States,* 26 CIT 330, 339, 201 F. Supp. 2d 1267, 1276 (2002).

In its Preliminary Results, Commerce determined that Dubai Wire did not have a viable home market and instead used Dubai Wire's third country sales to Canada to

calculate normal value.  Prelim. Mem. at 7 n. 20, 8, 10; *see also* Analysis Mem. for Dubai Wire FZE (Dep't Commerce June 18, 2014) ("Third Country Analysis Mem.") at 1, 2, CJA Doc. 40; CR 59 (finding that the Canadian market was viable for third country comparison purposes because the "aggregate volume of third [ ] country sales to Canada was greater than five percent of its aggregate volume of U.S. sales of the subject merchandise").

In its briefing to Commerce, Plaintiff argued that Commerce "should conduct its comparison market viability test in the same commercially realistic manner as IBP reported its sales," i.e., based on all warehouse sales of product types identical to those purchased from Dubai Wire and regardless of origin.  IBP's Case Br. at 11; *see also* I&D Mem. at 12.  Commerce rejected this argument, explaining that "Dubai Wire's third [ ] country sales reported as derived quantities, as supported by the record of this case, appear to be legitimate sales of merchandise identical to that which is sold in the United States, in the usual commercial quantities" and that "we determine that IBP's reported third [ ] country sales quantity of foreign like product, which exceeds the five percent third [ ] country market viability threshold, satisfies the statutory and regulatory threshold of third [ ] country market viability on a volume basis."  I&D Mem. at 14.  As such, "for the final results . . . [Commerce] continue[d] to use Dubai Wire's third [ ] country sales as a basis for [normal value]."  *Id.*

Plaintiff renews the same arguments before the court.  In its brief to the court, Itochu reiterates that Commerce "should have conducted its comparison market viability test in the same commercially realistic manner as IBP reported its sales" and that doing

so would show that Canada is not a viable third [ ] country market.  Pl.'s Br. at 26-30; *see also* Confidential Pl.'s Reply Br. ("Pl.'s Reply") at 14, ECF No. 37 ("Since PrimeSource sells its nails in Canada and the United States without regard to, or mention of, origin and without any variation in the CONNUM specific price or quantity of nails based on source, [Commerce] should have based its viability analysis on PrimeSource's Canada and U.S. market sales as a whole").  According to Plaintiff, such a calculation would conform to the manner in which PrimeSource conducts its business, would accurately reflect the comparative size and importance of each market, track observations and sales as they are reported in Itochu's databases, and be consistent with the manner in which Commerce calculated Dubai Wire's dumping margin.  Pl.'s Br. at 30.  Citing to *United States v. Eurodif S.A.,* 555 U.S. 305 (2009), Plaintiff argues that Commerce had an obligation to consider Itochu's economic reality in its market viability analysis.  Pl.'s Reply at 12 (citing *Eurodif,* 555 U.S. at 317 ("It is well settled that in reading regulatory and taxation statutes, form should be disregarded for substance and the emphasis should be on economic reality.")) 

      Defendant responds that Commerce's selection of Canada as the third country market was in accordance with 19 U.S.C. § 1677b(a)(1)(B)(ii)(II), because Dubai Wire's home market did not meet the five percent viability test, and "Dubai Wire's sales of nails to Canada, by quantity or by value, met the five percent threshold required by law." Def's Opp'n at 20.  Defendant further explains that Itochu's "third [ ] country market argument includes consideration of non-UAE originating merchandise, and in doing so, fails to comply with the statute" and is contrary to Commerce's practice of including only

foreign like product, as defined in 19 U.S.C. § 1677(16), in its viability calculation.  *Id; see also id.* at 24 ("Itochu's proposed market viability analysis may inappropriately include merchandise that is produced by parties other than Dubai Wire, outside of the UAE")*.*  Defendant-Intervenor concurs in this argument.  Def.-Intervenor's Br. at 16-18.

At Oral Argument, Plaintiff acknowledged that, notwithstanding their legal argument for determining viability consistent with commercial reality, Commerce's factual assertions regarding Dubai Wire's sales based on the data provided by Dubai Wire in its questionnaire responses are correct and that a viability test conducted on the basis of Commerce's legal position would support a finding that Canada is a viable third country market.  *See* Transcript of Oral Argument ("Oral Arg. Tr.") at 15-25, 51, ECF No. 59.  However, Plaintiff did not concede its legal argument that Commerce should have acted consistent with "commercial reality" and instead used Itochu's aggregate data to find Canadian sales not to be a viable basis for determining normal value.  Oral Arg. Tr. at 51-52.  Thus, only Plaintiff's legal argument remains, and it is without merit.

Plaintiff claims support for its argument from *Eurodif*, noting the reference therein that "form should be disregarded for substance and the emphasis should be on economic reality."  Pl.'s Reply at 12 (quoting *Eurodif*, 555 U.S. at 317-18).  A careful reading of *Eurodif*, however, makes plain that Plaintiff seeks to turn that case on its head.  The *Eurodif* plaintiffs had argued that the provision of low enriched uranium ("LEU") from foreign enrichers to domestic utilities was not subject to the antidumping laws due to the nature of the "SWU contracts" (separative work unit contracts governing enriched uranium transactions) pursuant to which the LEU was  sold.  The Court

affirmed Commerce's ability to treat these "SWU contracts" as contracts for the sale of goods (thus making them subject to the antidumping laws), notwithstanding the claims of the parties to those contracts that they were for the provision of enrichment services.

Itochu's reading of *Eurodif* position would have the court disregard the form of a public law by reinterpreting the meaning of "foreign like product" to suit the nature of Itochu's private transaction. That PrimeSource may commingle nails purchased from sources other than Dubai Wire such that they lose their origin prior to selling them to an unaffiliated customer does not make all the commingled nails foreign like product. "Foreign like product" is statutorily defined as "merchandise produced in the same country and by the same person as the subject merchandise." 19 USC § 1677(16). While Itochu invokes *Eurodif* to bend the statute to its practices, the point of *Eurodif* is that the agency may look beyond the labels attached to a transaction to focus on what is truly relevant under the statute. Just as the Court said that "public law is not constrained by private fiction," *Eurodif*, 555 U.S. at 318, Commerce was not constrained to treat all PrimeSource sales in Canada as foreign like product simply because PrimeSource had commingled nails from various sources. Commerce properly limited the foreign like product to that portion of sales allocated to Dubai Wire.

For the Final Results, Commerce followed the statute and regulations, found that Dubai Wire and Itochu's sales data were reliable, and on that basis determined both that Dubai Wire's home market was not viable and that Canada was a viable third [ ] country market for comparison purposes. I&D Mem. at 14. Commerce correctly found that "viability should be determined (only) by comparing merchandise produced by the

respondent in the subject country" and declined to "conduct [its] viability test based on sales quantities reported which include merchandise produced by companies other than Dubai Wire and in countries other than the UAE." *Id.* at 13. Indeed, Plaintiff concedes that Commerce's factual assertions based on Dubai Wire's questionnaire responses are correct and relies only upon its legal argument that Commerce should have acted consistent with Itochu and Dubai Wire's commercial reality. *See supra* p. 17. Commerce's actions are consistent with the statute and regulations and the court finds that Commerce acted in accordance with law by relying on Canadian resale prices to calculate Plaintiff's dumping margin.

## CONCLUSION

In accordance with the foregoing, the court sustains Commerce's Remand Redetermination on the issue of affiliation between Itochu and Dubai Wire. Further, the court sustains Commerce's final determination on the issue of third country viability.

It is so **ORDERED**. Judgment will enter accordingly.

/s/     Mark A. Barnett
Mark A. Barnett, Judge

Dated: February 16, 2017
         New York, New York